CHRISTOPHER W. KATZENBACH
(SBN 108006)
Email: ckatzenbach@kkcounsel.com
KATZENBACH LAW OFFICES
912 Lootens Place, 2nd Floor
San Rafael, CA 94901
Telephone: (415) 834-1778
Fax: (415) 834-1842
Attorneys for Plaintiff MELISSA ANTABLIN

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELISSA ANTABLIN,<br><br>       Plaintiff,<br><br>vs.<br><br>MOTION PICTURE COSTUMERS, LOCAL #705, INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES AND MOTION PICTURE TECHNICIANS, ARTISTS AND ALLIED CRAFTS,<br><br>       Defendant. | ) Case No.  2:18-cv-09474-RGK (SSx)<br>)<br>) FIRST AMENDED COMPLAINT FOR<br>) VIOLATION OF LABOR<br>) MANAGEMENT REPORTING AND<br>) DISCLOSURE ACT, SECTIONS<br>) 101(a)(2), 101(a)(4) AND 102<br>)<br>) DEMAND FOR JURY TRIAL<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## JURISDICTION AND VENUE

1.    This Complaint arises under (a) Section 101(a)(2) of the Labor Management Reporting and Disclosure Act (LMRDA ) (29 U.S.C. § 411(a)(2)) (herein "Section 101(a)(2)") and (b) Section 101(a)(4) of the LMRDA (29 U.S.C. §411(a)(4) (herein "Section 101(a)(4)").   This Court has jurisdiction over the claims arising under federal law under Section 102 of the LMRDA (29 U.S.C. § 412) and under 28 U.S.C. §§ 1331 and 1337.

2.     Venue is proper in this district under 29 U.S.C. § 412, and under 29 U.S.C. § 1391(b), as the union that is the defendant to this Complaint maintains its principal offices in this judicial district, is engaged in representing or acting for employee members within this judicial district and a substantial part of the events or omissions giving rise to these claims occurred in this judicial district.

**PARTIES**

3.     Defendant MOTION PICTURE COSTUMERS, LOCAL #705, INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES AND MOTION PICTURE TECHNICIANS, ARTISTS AND ALLIED CRAFTS herein "Local 705") is a labor organization engaged in an industry affecting commerce within the meaning of section 3(i) and (j) of the LMRDA (29 U.S.C. § 402(i), (j)).  Local 705 is affiliated with and subordinate body of  the International Alliance Of Theatrical Stage Employees And Motion Picture Technicians, Artists And Allied Crafts (herein "IATSE"), an international labor organization engaged in an industry affecting commerce within the meaning of section 3(i) and (j) of the LMRDA (29 U.S.C. § 402(i), (j)).

4.     Local 705 is governed by a Constitution and Bylaws.  Local 705 is further subject to and obligated to follow the provisions of the Constitution and Bylaws of IATSE.

5.     Plaintiff MELISSA ANTABLIN ("Antablin") is an individual, and a member of Local 705 within the meaning of Section 3(o) of the LMRDA (29 U.S.C. § 402(o)).

**ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF**

    **A.**   **STATUTES INVOLVED.**

6.     Section 101(a)(2) of the LMRDA (29 U.S.C. § 411(a)(2)) provides:

Freedom of speech and assembly. Every member of any labor

organization shall have the right to meet and assemble freely with

2

1    other members; and to express any views, arguments, or opinions;

2    and to express at meetings of the labor organization his views,

3    upon candidates in an election of the labor organization or upon

4    any business properly before the meeting, subject to the

5    organization's established and reasonable rules pertaining to the

6    conduct of meetings: *Provided,* That nothing herein shall be

7    construed to impair the right of a labor organization to adopt and

8    enforce reasonable rules as to the responsibility of every member

9    toward the organization as an institution and to his refraining from

10   conduct that would interfere with its performance of its legal or

11   contractual obligations.

12        7.    Section 101(a)(4) of the LMRDA (29 U.S.C. § 411(a)(4)) provides in

13   part:

14       No labor organization shall limit the right of any member thereof to

15       institute an action in any court, or in a proceeding before any

16       administrative agency, irrespective of whether or not the labor

17       organization or its officers are named as defendants or respondents

18       in such action or proceeding, or the right of any member of a labor

19       organization to appear as a witness in any judicial, administrative,

20       or legislative proceeding. . . .

21        8.    Section 102 of the LMRDA (29 U.S.C. § 412) provides for a civil

22   action by anyone whose rights under the LMRDA have been infringed, and

23   provides in part:

24       Any person whose rights secured by the provisions of this title

25       have been infringed by any violation of this title may bring a civil

26       action in a district court of the United States for such relief

27       (including injunctions) as may be appropriate.

28

---

3

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

**B.    FACTS COMMON TO ALL CLAIMS FOR RELIEF.**

9.    Local 705 regularly publishes a newsletter entitled *The Costumer* as an official publication of Local 705.   Article Ten, Section 5 of the Constitution and Bylaws of Local 705 states:

> "The Costumer" shall be known as the official organ of this Local, and all minutes printed therein shall be considered as having been read at a regular membership meeting, and they shall stand approved as printed unless a correction is made at such meeting.

10.    The Business Representative at Local 705 is a member of Local 705's Executive Board.  Under Article 4, Section 6 of Local 705's Constitution and Bylaws, the Business Representative, among other things, (a) has "charge in general of all business affairs of the Business Office," (b) is "the representative of this Local, and of the members, in all relations with the respective employers," and (c) has "authority over all correspondence, papers, books, resolutions, minutes, and other documents pertaining to the general affairs of this Local".

**1.    Antablin's Work As A Costumer And Work As Chair Of The Education Committee.**

11.    Antablin has been a member of Local 705 for in excess of 30 years. Antablin had been regularly and steadily employed as a costumer on television and motion picture productions before the events alleged in this Complaint. Additionally, Antablin was a well-regarded costume designer for local theater in the Los Angeles area for which her volunteer work was valued and recognized, and had other paid positions as a wardrobe supervisor and/or costumer in Los Angeles theater productions with Actors Equity performers.

12.    As a matter of routine practice, production companies delegate the hiring of costumers to the costume supervisors for the production and/or other supervisors who were also members of Local 705 and/or costume designers who

are members of IATSE Local 892 or are dual card members of both Local 705 and Local 892.

13.     As a matter of routine practice, hiring of costumers for productions is based on word-of-mouth recommendations and reputation.  Recommendations and reputation include the reputation for getting along, working well with others and avoiding disputes, including internal union disputes.

14.     Disputes with Local 705 over internal union issues, the filing of internal union charges, and allegations that a costumer made unjustified requests for compensation from Local 705 or misspent union money, affect the reputation of a costumer and negatively affect a costumer's hiring on productions and in other employments.  By way of example, and not limitation, how such matters affect, and are perceived to affect, reputation and ability to be hired or employed:

a. In May 2016, Antablin received an unsigned letter that stated:  "I am a concerned union member asking you to drop these charges[.]  It is in no way going to help you win or lose.  There is [sic] a lot of angry members[.]  This is costing the union a lot of money and taking a lot of time [a]way From members life's.  This is a career killer for you[.]  I hate to say that if you don't drop these charges And you go th[r]ough with this there is no one that will hire you ever is That worth it this current- board members only have a year and half left Any ways[.]  Please stop while you have a chance[.]  A concerned friend and follow [sic] costumer[.]"

b. In the June 2016 edition of *The Costumer*, Local 705 Business Representative ("BR") Bob Iannacone admitted that reputation and falsehoods concerning members directly affected the ability of members to be employed.   Iannacone stated in *The Costumer*, among other things:

i.     "I only ask that any member indulging in these practices take a minute and realize the possible consequences of dispersing these

5

erroneous statements. The damage caused to the subject of these falsehoods in reputation and possible employment."

ii.   "For the livelihood, reputation and career of your union brothers and sisters take a minute before speaking about others."

iii.   "We continue to gain employment by reputation."

c.   On or about March 22, 2018, Antablin, in applying for work, was told by a costumer supervisor that Antablin could not be hired because another costumer on the production was an advocate and defender of Local 705 President Brown and that hiring Antablin would be a bad move with repercussions.

d.   On or about October 30, 2019, when Antablin stated that she was having difficulty finding work because of the internal union charges Antablin had filed, a costume supervisor questioned if that was the reason and stated that she had heard that Antablin had asked to be paid for her volunteer work Antablin had previously performed as education committee chair and indicated that this was the reason Antablin was not being hired.  The supervisor making these statements had extensive experience in the motion picture and television industry in hiring costumers for productions.

15.   Local 705 has endorsed and approved the policy of getting along with others as a significant factor for employment.   Local 705 has endorsed and approved that the factor of getting along with others includes avoiding internal union disputes and avoiding bringing of union charges against officers, and particularly charges that are dismissed or otherwise denied.  For example, and without limitation:

a.   On or about October 16, 2019, a member of Local 705's executive board (Amy Elise Roberts) stated agreement with the statement by a member

and costume supervisor hiring for a production (Bob Morgan) that playing well with others is more important than experience in being hired.  The statement about playing well with others and Local 705's support of that statement was posted on social media that was routinely used by Local 705's members for locating employment and seeking work.

b. The statements alleged in subparagraph a followed an October 12, 2019, membership meeting where the Chair of one of Local 705's committees, Valerie Laven-Cooper, stated, while presenting a report from the committee, that members should not waste time and money bringing charges against Local 705 officers.  No officer of Local 705 present at the meeting stated any disagreement with the foregoing statement by Laven-Cooper.  Members reading the statements alleged in subparagraph a would have understood that the statements in subparagraph a referred to the statement by Laven-Cooper at the October 12, 2019, membership meeting.

   i.  At the same meeting, in response to Laven-Cooper's remark, Antablin stated that each member has a right to file charges in order to be heard and to seek justice or resolution of disputes.  No officer of Local 705 present at the meeting stated any agreement with the foregoing statements by Antablin.

c. On or about July 13, 2016, Local 705 President Nickolaus Brown posted on a Facebook board read by Local 705 members comments critical of persons disagreeing with him and included the statement "We will be stronger with unity, weaker when we attack each other."  The member to whom Brown's comments were directed understood Brown's comments to be retaliation for disagreeing with Brown over internal union matters

7

and stated to other members in response to Brown's comments: "if you disagree with our 705 President you will get a tongue lashing."

16.    In Fall 2014, Antablin was duly appointed to the position of Chair the Education Committee at Local 705.  Thereafter, Antablin's position as Chair of the Education Committee was continued by President Nickolaus Brown following Brown's election in June 2015 and pursuant to President Brown's decision to continue the membership of all committees, including the Education Committee following his election.

17.    As Chair of the Education Committee, Antablin was instrumental in organizing training and other events for the members of Local 705, including developing materials that resulted in approval of funding of over $92,000 for educational programs.

## 2.    Local 705 Discriminates Against And Assaults Antablin When She Tries To Present Education Committee Proposals For 2016.

18.    In about October 2015, Antablin presented proposals for educational programs for 2016 to Local 705 President Nickolaus Brown and Local 705 Assistant Business Representative ("ABR") Bethany Jane Bohatila.  The general membership of Local 705 was informed that Antablin had presented these proposals.  Antablin presented her proposals to the Local 705 Executive Board on November 7, 2015.

19.    Thereafter, Antablin prepared additional proposals to fund a position for an educational program director to carry out the programs proposed for 2016. ABR Bohatila insisted that ABR Bohatila, not Antablin, present these proposals to the Local 705 Executive Board for review and approval at the Executive Board's December 12, 2015 meeting.

20.     As part of the budget proposals Antablin prepared and submitted to ABR Bohatila, Antablin submitted a proposed budget that stated that the Executive Board had previously approved, as part of the 2015 budget, money for the production, filming and editing of educational videos.  ABR Bohatila did not dispute Antablin's statement that the Executive Board had previously approved money for the production, filming and editing of educational videos.

21.     Antablin is informed and believes, and thereon alleges, that the Executive Board regularly allowed members to address the Board at its meetings. As an example, but not by way of limitation, Antablin is informed and believes that at the December 12, 2015 meeting of the Executive Board, the board admitted Local 705 member Bobi Garland to the meeting and allowed her to speak; Garland was not a member of the Executive Board and was not on the agenda for the December 12, 2015 meeting.  As a further example, in 2016, the Executive Board admitted Local 705 member Dodi Shephard to the Executive Board meeting and allowed her to speak.

22.     Because of ABR Bohatila's position, on January 5, 2016, Antablin wrote to the Executive Board, by letter addressed to the Executive Board in care of ABR Bohatila, that Antablin was withdrawing her proposals and would be submitting new proposals at the February 6, 2016, Executive Board meeting.

23.     On February 1, 2016, Antablin submitted a new proposal to the Local 705 Executive Board for a new paid position to produce educational programs for members of Local 705.  In making this proposal, Antablin stated that she would present this proposal at the February 6, 2016 Executive Board meeting.

24.     On February 3, 2016, Antablin provided ABR Bohatila with a message to be published in Local 705's weekly email blast to members, known as *The Thread*, encouraging members to enroll in upcoming educational classes.  This

1  proposed message was addressed to "Fellow Members" and signed "Melissa

2  Antablin, Chair 705 Education Committee."

3       25.    On February 5, 2016, without telling Antablin, ABR Bohatila failed to

4  publish in *The Thread* the message from Antablin to the members about the

5  upcoming classes.  ABR Bohatila published different information about upcoming

6  education classes in *The Thread*.  Later on February 5, 2016, all the information on

7  education classes was removed from *The Tread*.  Antablin is informed and

8  believes, and thereon alleges, that the information was removed from *The Tread* on

9  February 5, 2016, sometime after Antablin re-stated to Local 705 that she would

10  present her proposal for education classes to the Executive Board at the February 6

11  meeting.

12       26.    On February 5, 2016, Antablin re-stated to Local 705 President Brown

13  that she would present Antablin's proposal to the Local 705 Executive Board on

14  February 6.  About two hours after Antablin's conversation with Brown, Antablin

15  received a text message from ABR Bohatila.   In this text message, ABR Bohatila

16  told Antablin that Antablin could not attend the Executive Board meeting because

17  these meetings were private and Antablin needed to be invited.  ABR Bohatila

18  stated that she would present the proposal Antablin had prepared.

19       27.    After receiving the foregoing text message from ABR Bohatila on

20  February 5, 2016, Executive Board Member Nancy Grossi told Antablin that ABR

21  Bohatila was wrong and that Antablin could come to the Executive Board meeting.

22       28.    At some point thereafter, ABR Bohatila told Grossi that Antablin's

23  proposal would not be submitted to the Executive Board because a few people had

24  asked her not to distribute the proposal.

25       29.    On February 6, 2016, Antablin came to Local 705's offices prepared

26  to present the proposal she had prepared.  As Antablin was attempting to enter the

27  foyer outside the meeting room, Business Representative ("BR") Bob Iannacone

28

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

slammed the exterior door to the foyer room in Antablin's face and held it to prevent her from entering.  Following Antablin's unsuccessful effort to enter, BR Iannacone opened the door, came out, grabbed Antablin and pushed her against the walkway railing.  Thereafter, BR Iannacone and Local 705 President Brown blocked the entry to the building.  After Antablin stated that the proposal was on the meeting agenda, Brown stated that he would not allow the presentation of the proposal at the meeting.

30.    At the time of the actions by Iannacone and Brown alleged in paragraph 29, the Executive Board meeting had not yet started, Brown had not made any order in connection with his duties as presiding officer of the Board to have Antablin leave the meeting and there had been no vote to have Antablin present or to have Antablin leave, or to set aside Executive Board member Grossi's invitation to Antablin that Antablin could attend the meeting.

31.    Board Member Nancy Grossi opened the entry door to the foyer and meeting room that was blocked by Iannacone and Brown.  Grossi stood in the open doorway while she asked Brown and Iannacone what going on.  In response to Grossi's actions, Brown and/or Iannacone shouted at Grossi to get inside because this was none of her business.  Grossi asked why Antablin was not being allowed to enter.  Brown and/or Iannacone again shouted at Grossi to get inside.  Grossi turned around and walked into the boardroom where she sat down and informed the other Board members what was happening.

32.    Leaving the entry door open, BR Iannacone and President Brown hurriedly entered the building and went to the meeting room.   Thereafter, Brown said Grossi was out of order, ordered her to leave and threatened to bring her up on charges.  ABA Bohatila asked if she should call the police.

33.    While the exchange alleged above was going on, Antablin briefly entered the meeting room and left a copy of the proposal on the boardroom table

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

and returned to the foyer.  Shortly thereafter, President Brown adjourned the meeting and Antablin left the building.

**3.  Antablin Files A Police Report Concerning The Assault On Her And Is Summarily Removed From Her Position As Chair Of The Education Committee.**

34.  At about 5:30 p.m. on February 6, 2016, Antablin filed a police report concerning the events at Local 705 earlier that day.  This report identified BR Iannacone as having assaulted Antablin.   Antablin is informed and believes, and thereon alleges, that Local 705 was aware of this complaint shortly after it was filed.

35.  On February 8, President Brown removed Antablin from the position as Chair of the Education Committee and appointed Renee Nault to this position. President Brown lacked cause or reason to remove Antablin from her position as Chair of the Education Committee.  President Brown provided Antablin no explanation for her removal from her position as Chair of the Education Committee and provided Antablin no opportunity to object or respond to Brown's actions or to respond to any allegations purporting to justify her removal.

36.  Antablin is informed and believes, and thereon alleges, that President Brown removed Antablin from her position as Chair in retaliation for her filing a police report and in retaliation for her effort to attend the Executive Board meeting on February 6 and present her proposal.

**4.  Local 705 Makes False Allegations Against Antablin Concerning Her Actions As Chair Of The Education Committee.**

37.  Before and following the events on February 6, various members of the Executive Board, including Carmen Lozano, asserted that Antablin's education

proposal included paying Antablin for Antablin's past services as Education Committee Chair.  This statement was false and was known to be false by the persons making the statement.

38.     Local 705 has refused Antablin an opportunity to correct the false statement that she sought payment for past services as Education Committee Chair, including denying her the opportunity to present her proposal at the February 6 meeting or at any time thereafter.

39.     Plaintiff is informed and believes, and thereon alleges, that, notwithstanding the falsity of this statement and knowledge of its falsity, the assertion that Antablin had proposed being paid for past services was made at one or more meetings of the Executive Board, including at a meeting of the Executive Board on February 9, 2016.

40.     Antablin is further informed and believes, and thereon alleges, that Local 705 President Brown and/or BR Iannacone asserted at the Executive Board meeting on February 9, 2016, and/or at other times, that Antablin had been offered a paid position but she had turned it down because her price was too high.  This statement was false and was known to be false by President Brown and BR Iannacone.   Antablin had not been offered any paid position at Local 705.

41.     At the August 2016 Executive Board meeting, Antablin was accused of spending "unapproved funds" for videographic services.   The videographic services involved videos of educational programs for costumers.  In the September 2016 publication of *The Costumer*, Local 705's report of the August 2016 Executive Board meeting stated that Antablin had spent "unapproved funds" for videographic services.  The statements that Antablin had spent "unapproved funds" for videographic services were false and known to be false by Local 705.  In fact, the funds for these videographic services had been approved by the Executive Board, including at the June 9, 2015, Executive Board meeting, and such approval

had been stated, without dispute, in the 2016 budget proposals Antablin had submitted to Local 705.

42.     Antablin is informed and believes, and thereon alleges: At or around the same time Local 705 asserted that Antablin had expended unauthorized funds for videographic services, BA Iannacone stated that Local 705 would pay for the videos  involved so long as Antablin did not appear in any of the videos.

43.     The statements that Antablin sought payment for past services, turned down an offer of employment because her price was too high and had expended "unapproved funds" were published and circulated to the membership of Local 705.  Each of these statements was false and untrue and known to be false and untrue by Local 705 at the time they were published and circulated to the membership of Local 705.  These statements were detrimental to Antablin's reputation and status among the members and caused members to look down upon Antablin and to be hostile to her.

44.     Antablin is further informed and believes, and thereon alleges: that the allegations that Antablin sought payment for past services, turned down an offer of employment because her price was too high and spent unapproved funds has adversely affected her ability to obtain employment as a costumer by portraying her as dishonest and unreliable, as a person who misuses union funds, and as a bad union member; that these allegations have induced members of Local 705 who hire costumers for productions not to hire Antablin or retain Antablin in employment, but to give preference in hiring to other Local 705 members; that these false allegations have encouraged or induced members of Local 705 to be hostile to Antablin, to be unwilling to work with her and to encourage members to object to having Antablin hired for work as a costumer, and have negatively affected Antablin's ability to be hired or retain employment.

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

**5.**  **Antablin Files Internal Union Charges; Local 705 Rewards Trial Board Members Who Voted Against Antablin's Charges And Provides False Information To The Trial Board That Antablin's Charges Were Untimely.**

45.     On April 2, 2016, Antablin filed charges against BR Iannacone, ABR Bohatila, President Brown, Executive Board Members Carmen Lozano, Noel Leonard, Deborah Ash, Jeff Hartman and Deborah Curtis pursuant to Article 14 of the Constitution and Bylaws of Local 705.

46.     Article 14, Part 2, Section 1 of the Constitution and Bylaws of Local 705 provides, in material part as to the selection of a trial board to hear charges: "A Trial Board . . . shall be elected by secret ballot at a regular membership meeting."

47.     Notwithstanding Article 14, Part 2, Section 1 of the Constitution and Bylaws of Local 705, Local 705 called a special meeting of the members for May 21 2016, to elect a trial board of five members to hear the charges.  This trial board consisted of Amy Elise Roberts, Adam West, Radford Polinsky, Mitchell Kenney, and Jeffery Schoenberg with Bill Edwards and Leo Castro chosen as alternates.  At this special meeting, Antablin identified herself as the accuser in order to object to the procedure that was followed on the basis that all members had not received the email notifying members of the special meeting.

48.     Article 16, Section 8, of the Constitution and Bylaws of IATSE in effect at the time Antablin filed charges, provided, in material part:  "After the local union has taken cognizance of the charges, they shall be read at the next regular meeting of the local union by the presiding officer."

49.     Notwithstanding Article 16, Section 8, of the Constitution and Bylaws of IATSE, Local 705 refused to read the charges to the membership of Local 705 at either the special meeting or at a regular meeting.

50.     Antablin is informed and believes, and thereon alleges: Local 705 called a special meeting to elect a trial board in order to enable the officers of Local 705 to pack the meeting with members who would be biased in favor of the Local 705 officers and to avoid having a trial board elected at a general membership meeting at which fewer members attending would be biased in favor of the Local 705 officers; Local 705 refused to read Antablin's charges to the membership in order to cover-up the nature of the allegations Antablin had made, and to enable the trial board to dismiss the charges and to present the charges as lacking merit by distorting Antablin's claims and without having to address the actual events Antablin alleged; Local 705 used a procedure of electing a trial board to mislead the members of Local 705 into believing that the trial board conducted a fair hearing on Antablin's charges.

51.     Antablin is further informed and believes, and thereon alleges:  Local 705's attorney met with the trial board *ex parte* and outside the presence of Antablin to induce the trial board to dismiss the charges Antablin had made.

52.     The results of the special meeting on May 21, 2016, were reported in *The Costumer* for June 2016.  This report identified Antablin as the accuser.  The June 2016 edition of *The Costumer* was distributed to Local 705's membership on or about June 1, 2016.

53.     The trial board had at least two members (Adam West and Mitchell Kenney) who were personal friends and associates of persons who had been charged, including Iannacone and Bohatila.  Among other things, on or about April 7, 2016, after Antablin filed her charges and before being elected to the trial committee, West publicly urged support for Local 705's leadership, stating, inter

alia, "I just want to applaud Nickolaus Brown, Bob Iannacone, Bethany Jane Bohatila and the rest of the gang for really working for all of us."  In addition, trial board member Amy Elise Roberts was a personal friend of Local 705 President Brown.

54.     Antablin is informed and believes, and thereon alleges:  On July 7, 2016, at the Local 705 Executive Board meeting, Executive Board member Lisa Harris informed the Executive Board that a resolution of Antablin's charges had been reached.  Harris was not on the trial board and the trial board decision had not been announced prior to Harris' statement.

55.     On July 7, 2016, at the Local 705 Executive Board meeting, President Brown appointed trial board member Amy Elise Roberts to a position as alternate executive board member.   President Brown stated this appointment was because Roberts had received the second-highest number of votes in the prior election for at-large executive board member.

56.     President Brown's statement Roberts had received the second-highest number of votes in the prior election for at-large executive board member was untrue and misleading.

57.     In the prior election, Roberts had received one (1) vote out of 508 votes and the two other unsuccessful candidates for that position (Paul DeLucca and Sue Bub) had also received one (1) vote each.

58.     Antablin is informed and believes, and thereon alleges that the appointment of Roberts on July 7, 2016, was a reward for Robert's voting on the trial committee to dismiss the charges Antablin had brought.

59.     Thereafter, in connection with elections at Local 705 in 2018, trial board members West and Roberts have been endorsed and supported by President Brown as candidates for election.

60.     On about July 9, 2016, the trial board issued a report dismissing the charges Antablin had filed.  This report was presented to the members of Local 705.

61.     Antablin's charges had been a subject of discussion on the costumer forum on Facebook.  By way of example, and not limitation, Local 705 member Steven Zimbelman posted in the forum:  "The hearing board found all charges to be invalid and were dismissed."

62.     In connection with this decision, the trial board stated that Antablin had filed the charges on April 6, 2016, and relied on that date to dismiss many of the charges Antablin had made.

63.     Antablin is informed and believes, and thereon alleges: the trial board received the information that the charges were filed on April 6, 2016 from Local 705.  This information was false, as Antablin had filed the charges prior to April 6, 2016.   Antablin is informed and believes, and thereon alleges, that Local 705 gave this false date to the trial board to induce the trial board to dismiss Antablin's charges and to enable the trial board to rule that her charges were meritless and unjustified.  The information provided to the trial board, on which it apparently relied to assert that the charges were filed on April 6, was not provided to Antablin prior to the decision of the trial board.

64.     Antablin is informed and believes, and thereon alleges:  Local 705 took the actions alleged in paragraphs 46 through 63 hereinabove in order to harm Antablin's reputation, to prevent members from hearing the actual allegations Antablin made, to cause the trial board to dismiss the charges and to present Antablin as having made unjustified and unmeritorious charges that the membership would perceive as a waste of time and union money.

**6.      Antablin Appeals; Local 705 Does Not Serve Antablin With Its Response As The Constitution Requires; Local 705's Response Repeats False Statements About Antablin.**

65.      On August 8, 2016, Antablin filed and served an appeal from the decision of the trial board with the President of IATSE.  Local 705 responded to this appeal.

66.      Local 705 did not serve Antablin with a copy of Local 705's response to her appeal.

67.      At all material times, the IATSE Constitution and Bylaws required Local 705 to serve its response on Antablin, providing in Article 17, Section 4: "the lower tribunal shall also answer the appeal, setting forth reasons in support of its decision, and shall at the same time serve a copy of such answer by certified mail upon the appellant at the address specified by him in his appeal."   This section of the IATSE Constitution and Bylaws further provides: "Decisions of an appellate tribunal shall be based entirely upon the record as a whole and evidence not introduced before the tribunal of original jurisdiction shall not be permitted."

68.      In its response to Antablin's appeal, Local 705 claimed as a fact, among other things, that Antablin had sought payment for services she had performed as a volunteer.  This statement was false and was known to be false by Local 705 when it was made.  No evidence had been submitted to the trial board to substantiate a claim that Antablin had sought payment for services she had performed as a volunteer.

69.      Antablin is informed and believes and thereon alleges:  Local 705 did not serve Antablin a copy of its response to her appeal to interfere with Antablin's ability to object to or correct Local 705's false statements and new evidence, and to enable Local 705 to submit false information on the appeal to induce IATSE to

1  deny Antablin's appeal.   In taking these actions, Local 705 intended to harm

2  Antablin's reputation as having brought charges that were entirely unjustified and

3  without merit that the membership would perceive as a waste of time and union

4  money.

5      70.    On or about December 7, 2016, IATSE denied this appeal.

6          **7.    Antablin Files A Complaint With The**

7          **Department Of Labor; Local 705 Refuses To**

8          **Provide Antablin Audio Tapes Of Meetings.**

9      71.    In about December 2016, Antablin filed a complaint with the United

10  States Department of Labor concerning the actions of Local 705 and the decision

11  of the trial board and IATSE.  Antablin is informed and believes, and thereon

12  alleges, that Local 705 was aware of this complaint shortly thereafter.

13     72.    Since about February 2016, Antablin has requested copies of the

14  audio tapes of Executive Board meetings and has requested that Local 705

15  preserve those audio tapes.  These audio tapes would show, among other things, if

16  Board members expressed hostility towards Antablin and if Board Members made

17  false or derogatory statements about Antablin.  Local 705 has refused to provide

18  such audio tapes to Antablin.

19     73.    In or about January 2017 at a membership meeting, ABR Bohatila

20  expressed concern that the Department of Labor would be coming down hard on

21  labor unions.  ABR Bohatila further stated that she had been told at a recent IATSE

22  Officer Training Institute meeting that local unions should immediately destroy

23  recordings of Executive Board meetings upon publication of the Executive Board

24  Minutes, that the existence of these recordings creates potential liability for the

25  Local and that her opaque style of writing minutes had been praised at the Officer

26  Training Institute meeting.

27

28

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 8.    Local 705's Hostility Towards Antablin and Towards Other Persons Perceived To Have Supported Her.

74.    Local 705 has taken hostile, unjustified, harmful, retaliatory and discriminatory actions against Antablin and persons who appear to support her, including but not limited to that actions alleged previously in this Complaint and as follows:

a.    Local 705 failed to serve Antablin with a copy of Local 705's response to Antablin's appeal.

b.    In order to get the charges dismissed, Local 705 misrepresented the date Antablin's internal union charges were filed.

c.    Local 705 falsely accused Antablin of seeking payment for past services as a volunteer and turning down an offer of employment because her price was too high.

d.    Local 705 has refused to provide Antablin a copy of audio recordings of the Executive Board meetings.  Antablin is informed and believes, and thereon alleges, that false and negative comments were made about her during Executive Board meetings and that the refusal to provide copies of the audio tapes was part of a pattern to conceal the hostility of Local 705 and its officers towards Antablin.

e.    Executive Board member John Van Hout has informed Antablin that he perceived hostility because Antablin did not file internal charges against him, he was therefore considered to be on the wrong side of the dispute and that this fact has affected him negatively in his treatment at Executive Board meetings.

f.    On or about August 7, 2016, Executive Board member Nancy Grossi, was told she would have to reclassify her union status.  Grossi had not

21

been charged by Antablin and had supported Antablin's right to speak at the Executive Board meeting and opposed Antablin's treatment by President Brown and BR Iannacone.  This reclassification would force Grossi to pay an additional $1,000 (one thousand dollars) to Local 705.   In an email dated August 7, 2016, Grossi stated to Local 705's lawyer (Hope Singer):  "Since this campaign to get me to re-classify co-insides with events leading up the filing of charges by a 705 member against the 705 BR and others, this action appears to be a retaliatory actions against me."  Local 705 did not respond to Grossi's request for an explanation until September 5, 2016, at which point they provided no explanation for Local 705's demand that she be reclassified and did not deny Grossi's statement that the reclassification was in retaliation for Grossi's support of Antablin.

g.    Local 705 has falsely accused Antablin of spending "unapproved funds" for videographic services.

e.    (i) At various times, Antablin's comments on member electronic forums have been removed, including comments by her as to the availability of training videos that were prepared when she was Chair of the Education Committee and edited by her after she was removed from that position.  At the same time, comments favorable to the new Chair of the Education Committee have been posted on such forums and allowed to remain. (ii) At one or more other times, comments by members that were favorable to Antablin have also been removed from boards and forums otherwise used by members to discuss union matters.  (iii) Antablin is informed and believes, and thereon alleges, that her comments and comments supportive of and favorable to her

have been removed at the request of Local 705 or its officers and agents.

f.   In about June 2019, after learning that Antablin was the only person receiving dues deferrals or short-term loans from Local 705 to enable her to be current in her union dues, Local 705 cancelled its longstanding policy and practice of making dues deferrals or short-term loans to members to enable them to pay dues timely.

g.   On or about May 17, 2020, Local 705 filed a form LM-2 with the United States Department of Labor stating that Antablin had paid Local 705 over $14,000 as a "Settlement." This statement was false. This statement would have been understood as representing that Antablin had committed some form of harm to Local 705 for which she was or would have been liable to Local 705 in damages and for which she paid Local 705 money as a settlement for damages or harm she had caused. In addition, members of Local 705 reading this statement on the Form LM-2 would have concluded that Antablin had committed serious misconduct harming Local 705 and its members. Form LM-2 is a publicly-available document that Local 705 members can access and view.

75.   Members of Local 705 who have not filed charges or have not expressed disagreement with the officers and Business Representatives of Local 705 have received favorable treatment from Local 705 and those who have opposed or disagreed with the officers of Local 705 have received hostile, detrimental or negative treatment, including, but not limited to:

a.   BA Iannacone proposed, and Local 705 has paid, Renee Nault's salary for time Nault spent attending conventions and meetings, including ComicCon. Some of these trips occurred after Nault was Education

23

Committee Chair.  In addition, Antablin is informed and believes that Nault was promised an increase in her salary from Local 705 to compensate her for work as Education Committee Chair.

b.   Local 705 has used its resources to promote and praise work by Renee Nault as Education Committee Chair.

c.   Local 705 has used its official publications to promote persons associated with or supporting President Brown.

d.   Local 705 has punished persons disagreeing with or opposing President Brown, including, by way of example and not limitation: (a) removing Steven Zimbelman from his position on all union committees on which he served after he disagreed with President Brown over union issues; (b) removing Wanda Leavey from committee positions after she posted on Facebook comments favorable to Antablin and removing Leavey's posts favorable to Antablin from Facebook.

e.   Local 705 has responded to other members who have complained of bullying or aggressive conduct by BR Iannacone and has compelled BR Iannacone to apologize for such behavior.

f.   Local 705 has discriminated against persons who are associated with Antablin.  By way of example, after Local 705 learned that Joe Gordon was a personal friend of Antablin, Local 705 refused to pursue disputes Joe Gordon had with his employer, Muto-Little, concerning his employment classification and his ability to obtain hours to qualify him and be admitted to Local 705 in the classification of "tailor" or "alterations fitter" and became visibly hostile and cold to Gordon.

1

2

        **9.    Antablin Loses Work As A Result Of Her**
               **Opposition To Local 705's Actions.**

3       76.    Following the filing of the police report, the charges, the appeal and

4  the complaint to the Department of Labor alleged herein, Antablin has suffered a

5  reduction in and loss of work.  By way of example, and not limitation as to her loss

6  of work, Antablin has lost work as follows:

7           a.    In June 2016, Antablin was solicited and interviewed for work on a

8                 production, *Jane The Virgin*.  On June 13, 2016, shortly after

9                 members would have received *The Costumer* reporting Antablin had

10                filed charges against Local 705's offices and after Local 705 had

11                refused to read those charges to the members, Antablin was told by

12                the hiring costume designer:  "It was wonderful meeting you for

13                JANE.  I hope to work with you one of these days (you are incredible

14                & bring SO much to the table) however I'm going to bring someone

15                on that 2 of my crew members have worked with before."

16          b.    In November 2016, after being hired to work on a film *A Wrinkle In*

17                *Time*, and after working several days on this film in the preceding

18                work week, Antablin was told that there was no work for her because

19                the number of costumers had been reduced.  This statement was false

20                and the number of costumers had not been reduced.  The production

21                hired new costumers to replace Antablin, including an individual who

22                was not yet been sworn in as a member of Local 705.   Antablin's

23                work on this production prior to her discharge had been satisfactory

24                and without criticism.

25          c.    On about February 17, 2017, Antablin was let go from a job at Eastern

26                Costume.  The job involved cataloging costumes with barcoding.

27                Antablin was told that she would be rehired in approximately six

28

weeks when barcoding resumed.    Antablin is informed and believes, and thereon alleges, that barcoding resumed thereafter. Antablin was not rehired for this position. Antablin's work at Eastern Costume prior to her discharge had been satisfactory and without criticism.

d.      In about August 2017, Antablin was hired to work on a television production *American Crime Story: Versace*.  She was let go after several days of work.  Thereafter, when she inquired about further work on this production, she was told she would be contacted if work became available.  Antablin was not contacted thereafter for additional work.  Antablin is informed and believes that additional work for costumers *on American Crime Story: Versace* became available and was given to other persons.  Antablin's work on this production prior to her discharge had been satisfactory and without criticism.

e.      In September 2017, Antablin was hired to work on a television production *Fresh Off The Boat* for an initial period of three days. After working only one day, she was told she would be let go. Antablin convinced the supervisors to let her work one more day and then she was let go after working two days rather than the three days initially promised to her.  When she was let go, Antablin was told she would get a further day that week if it were available.  Thereafter, *Fresh Off The Boat* failed to give Antablin additional work that became available and which had promised to her.  Antablin's work on this production prior to her discharge had been satisfactory and without criticism.

f.      In September 2017, Antablin was hired to work as costume supervisor on a production *On My Block* to fill-in for the regular supervisor who

would be out-of-town.  At the time she was hired, Antablin was provided seven (7) specific dates she would be working and confirmed that she would be working those dates.  Antablin was given the keys to the office.  The day after she was hired, given the keys to the office and the work dates were confirmed, Antablin was told that the production did not need her services and that the original supervisor would be working the dates Antablin had been told she would be working.  Antablin is informed and believes, and thereon alleges, that a different costumer was thereafter hired as costume supervisor to fill-in for the original supervisor on the days Antablin was told she would be working.

g.      In October 2017, Antablin was hired to work on a production *Ghosted*.  Antablin was promised a work schedule of three days a week for the following three weeks and was further told that there would be the possibility of continuation of this position if the show was picked up by the network for additional episodes.  On the afternoon of Antablin's first day of work, Antablin was told that the production would not be able to honor this commitment or provide Antablin further work beyond one more day.  Antablin's work on this production prior to her discharge had been satisfactory and without criticism and, in fact, had been praised.

h.      Since August 2017, Antablin had worked on the production *S.W.A.T.* on various occasions, being called back to work multiple times.  After October 16, 2017, Antablin was not called back to work on this production until July 2018 when she work for three (3) days.  She was not called back thereafter.  Antablin's work on this production prior to her discharge had been satisfactory and without criticism.

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

i.  In November 2017, Antablin was told that to send her resume for part-time or daycheck work on a production *One Day She'll Darken*. Thereafter, when Antablin called to follow up on the availability of such work, she was told that the production would not be hiring, Antablin was given no further information and the call was abruptly terminated.

j.  In November 2017, Antablin was told to send her resume for work on a production, *A Christmas Story Live*.  Antablin was told that the production would get back to her.  After two weeks, Antablin called about work on this production, was told that the production was "pretty much" staffed unless someone dropped out or additional positions approved.   Antablin received no work on this production.

   1.  Bob Morgan was the costume supervisor hiring for the production at the time Antablin initially sought employment.

   2.  Morgan is the same person who stated that playing well with others was more significant than experience, as alleged in Paragraph 15(a) herein.

   3.  Morgan hired Valerie Laven-Cooper for this production. Laven-Cooper is the person who stated that members should not waste time and money bringing charges against Local 705 officers, as alleged in Paragraph 15(b) herein.

k.  At various time in September and October 2017, Antablin sought work on a production, *9-1-1*.  When Antablin spoke to the costume supervisor on this production, he appear hostile towards her and stated "I know who you are."   Antablin was not hired for this production.

l.  At various time from November 2107 through April 2019, Antablin sought work on a production, *Ratched*.   She was not hired.

28

m.   In July 2018, Antablin sought work on a production, *The Politician*. She received no response to her inquiries.

n.   From April 2019 to October 2019, Antablin made repeated efforts to obtain employment on the production, *Hollywood*.   Initially, the production told Antablin they needed costumers for a big week. Thereafter, she was offered only a single day of work.

o.   In October 2019, Antablin made repeated efforts to obtain employment on the production, *The Prom*.  She received no employment on this production.

p.   In March 22, 2018, Antablin sought work on the production of a children's version of *Masterchef*.  Antablin was told by the costumer supervisor that Antablin could not be hired because another costumer on the production was an advocate and defender of Local 705 President Brown and that hiring Antablin would be a bad move with implied repercussions.

q.   When Antablin stated that she was having difficulty finding work, a costume supervisor questioned if that was the reason and stated that she had heard that Antablin had asked to be paid for her volunteer work Antablin had previously performed as education committee chair.

77.   Local 705 has the habit and routine practices of:

a.  Obtaining and reviewing call sheets from members working on productions that show which members are being called for work as costumers.   Call sheets are issued by production companies for each day a show is filming and are distributed to employees on the production, including costumers.

29

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

b.  Soliciting members to forward call sheets to Local 705 by email when received by the member.

c.  Asking for the names of other persons employed as costumers on a production when members report employment to Local 705.

d.  Visiting job sites and observing who is employed on jobs as costumers.

e.  Obtaining and reviewing payroll information for employees that is submitted by employers.  This information is submitted to Local 705 on a weekly basis by Thursday for work in the preceding workweek.  The workweek for costumers is midnight Saturday to midnight the following Saturday.  The payday for the prior workweek for costumers is Thursday.

78.  Local 705 has, at various times including March 2016 and January 2019, used Local 705's publication, *The Costumer*, to solicit members to forward call sheets to Local 705 by email when received by the member.

79.  Pursuant to the Collective Bargaining Agreement ("CBA") with Local 705, Producers are obligated notify Local 705 of the names of persons working on productions.  Article VII, Section 55 of the CBA provides:  "Producer will notify Union of locations and names of crew assigned thereto.  Notice of same shall be given within twenty-four (24) hours in advance for work on distant locations.  For work on nearby location, notice shall be given as soon as practical."  Article 3(c) of the CBA requires Producers to give Local 705 written notice of the name of every costumer employed under the CBA within seven (7) days (Saturdays, Sundays and holidays excluded) from the date of employment.  Article VII, Section 57 of the CBA provides that at the end of each quarter the Producer shall give Local 705 a list of employees and their earnings.

80.  In early November 2017, Local 705 informed Antablin that she could not have an extension to pay reduced dues because Local 705 had been receiving reports that Antablin had been working.

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

81.     Antablin is informed and believes, and thereon alleges:  Shortly before Antablin lost work on the employments and productions alleged herein, Local 705 learned that she was working on those productions or in those employments through the receipt of call sheets for the production, by information received from members working on the production, by review of payroll information, by reporting from employers and/or by observation by Local 705 officers, agents or employees.

82.     Antablin is informed and believes, and thereon alleges, that Local 705's actions, including false statements against her and other actions by Local 705 causing harm to Antablin's reputation, have caused her to lose employment and employment opportunities, as follows, by way of example and not limitation:

a.     Within one or two days after Local 705 learned of Antablin's employment on *A Wrinkle In Time*, Local 705 told the persons in charge of hiring costumers that they should replace Antablin with another costumer.  Alternatively, the persons in charge of hiring learned of Antablin's filing of union charges and other disputes with Local 705, or the allegations and claims against or about Antablin. The persons in charge of hiring did not use or hire Antablin for reasons including, but not limited to, (i) they were members of Local 705 and did not want to antagonize the union or other union members, (ii) they supported the leaders of Local 705 against whom Antablin had brought charges, (iii) they were influenced not to employ Antablin by Local 705 false claims against her and (iv) they sought to appease other employees who were hostile to Antablin because of Local 705's false claims against Antablin or Antablin's filing of charges against Local 705's officers.

b.    At Eastern Costume, (i) Local 705 told Eastern Costume that they should not use Antablin or (ii) because of the false information and allegations against her that Local 705 had made, persons in charge of hiring were influenced not to hire Antablin, or (iii) because of the false information and allegations against her or Antablin's filing of charges against Local 705's officers, members of Local 705 said that the company should not use Antablin or indicated that they did not want to work with Antablin.   The persons in charge of hiring acceded in not using Antablin for reasons including, but not limited to, (i) they did not want to antagonize the union or union members working at Eastern Costume because Eastern Costume did substantial business with producers employing union costumers, and (ii) they were influenced not to employ Antablin by Local 705 false claims against her.

c.    At the productions  *Jane The Virgin*, *American Crime Story: Versace*, *Fresh Off The Boat, On My Block, Ghosted, S.W.A.T., One Day She'll Darken, A Christmas Story Live, 911, Ratched, The Politician, Hollywood,* and *The Prom*, (i) Local 705 told the persons in charge of hiring that they should not use Antablin or (ii) because of the false information and allegations against her, persons in charge of hiring were influenced not to hire Antablin, or (iii) because of the false information and allegations against her or Antablin's filing of charges against Local 705's officers, members of Local 705 said that the company should not use Antablin or indicated that they did not want to work with Antablin.   The persons in charge of hiring did not use or hire Antablin for reasons including, but not limited to, (i) they were members of Local 705 and did not want to antagonize the union or

other union members, (ii) they supported the leaders of Local 705 against whom Antablin had brought charges, (iii) they were influenced not to employ Antablin by Local 705 false claims against her and (iv) they sought to appease other employees who were hostile to Antablin because of Local 705's false claims against Antablin or Antablin's filing of charges against Local 705's officers.

83.     Because of and as a result and consequence of the actions of Local 705 alleged herein, Antablin has lost income and other economic benefits, has had her reputation among Local 705's membership harmed and diminished, has suffered physical illness and has suffered emotional distress, humiliation, anxiety, worry and sleeplessness.

## FIRST CLAIM FOR RELIEF

### Section 101(a)(2), (4) LMRDA – Free Speech, Right to File Charges

84.     The allegations in paragraphs 1 through 83 are incorporated by reference in this Claim for Relief.

85.     In submitting her proposal for educational programs at Local 705, in criticizing the actions of BR Iannacone, ABR Bohatila, President Brown, Executive Board Members Lozano, Noel Leonard, Deborah Ash, Jeff Hartman and Deborah Curtis, in filing internal union charges and in appealing the decision of the trial board, Antablin was exercising speech on matters concerning Local 705. Antablin's speech and acts alleged in this paragraph involved the exercise of rights under Section 101(a)(2) of the LMRDA.

86.     In filing a police report and in filing a complaint with the Department of Labor, Antablin was instituting actions or a proceeding before courts or administrative agencies or participating in such proceedings as a witness. Antablin's acts alleged in this paragraph involved the exercise of rights under Section 101(a)(4) of the LMRDA.

87.     As alleged hereinabove, Local 705, its officers and agents, were, are and continue to discriminate, retaliate, defame, harass, blackball and take other hostile actions against Antablin.  Such discrimination, retaliation, defamation, harassment, blackballing and other hostile actions have been directed towards Antablin and towards persons who Local 705 perceives as supporting her.

88.     Local 705 has harassed and made false statements about and false allegations against Antablin, has induced or encouraged persons and Local 705 members to view Antablin as dishonest, to have misused union funds and to have brought unfounded charges against Local 705's officers, has taken other hostile and discriminatory actions against her, and has interfered with, and sought to prevent Antablin from, retaining or obtaining work, because of and in retaliation for Antablin's exercise of rights under Section 101(a)(2) and 101(a)(4) alleged herein.  By such actions, Local 705 violated Sections 101(a)(2) and (4) and 102 of the LMRDA.

89.     Local 705 has falsely stated that Antablin spent unauthorized union funds, that Antablin turned down union employment because her price was too high, and that Antablin sought to have union funds used for Antablin's personal benefit by paying her for past volunteer work.  These false statements have been circulated and published to the membership of Local 705.   These false statements harmed Antablin's reputation and have caused Antablin to lose employment. Antablin is informed and believes, and thereon alleges, that these false statements have induced other persons, including other Local 705 members and Local 705 members who hire costumers for productions, to view Antablin as dishonest and to have misused union funds, and have further induced members not to hire Antablin, to oppose working with Antablin and to seek Antablin's removal from work for which she had been hired.  Local 705 made these false statements and published them to the members in retaliation for Antablin's exercise of rights under Section

101(a)(2) and 101(a)(4) and to harm Antablin's reputation and ability to obtain employment.  By such actions, Local 705 violated Sections 101(a)(2) and (4) and 102 of the LMRDA.

90.     Local 705 has supported and induced persons to hire costumers on the basis of how they get along with others and has supported the position that persons who express disagreement with Local 705's officers, or file charges against Local 705's officers, harm Local 705 and its membership.  By such actions, Local 705 intended to and did encourage members not to hire and not to work with members, including Antablin, who criticize Local 705 or its officers.  Local 705 took these actions to retaliate against Antablin for exercising rights under Sections 101(a)(2) and (4) of the LMRDA.  By such actions, Local 705 violated Sections 101(a)(2) and (4) and 102 of the LMRDA.

91.     Local 705 falsely represented in its LM-2 Report filed May 17, 2020, that Antablin had paid Local 705 over $14,000 as a "Settlement."  This statement would have been understood as representing that Antablin had committed some form of serious and substantial harm to Local 705.   Local 705 made this false statement and published them in the LM-2 Report in retaliation for Antablin's exercise of rights under Section 101(a)(2) and 101(a)(4) and for the purpose of harming Antablin's reputation.  By such actions, Local 705 violated Sections 101(a)(2) and (4) and 102 of the LMRDA.

92.     At all times alleged herein, Local 705 knew that employment as a costumer would be negatively affected by injury to Antablin's reputation, including by accusations that Antablin spent unauthorized union funds, that Antablin turned down union employment because her price was too high, and that Antablin sought to have union funds used for Antablin's personal benefit by paying her for past volunteer work.

93.     At all times alleged herein, Local 705 knew that employment as a costumer would be negatively affected by injury to Antablin's reputation arising from Antablin's filing of internal union charges against Local 705's officers and particularly where those charges were dismissed or found to be without merit. Antablin is informed and believes, and thereon alleges, that Local 705 manipulated the appointment of a trial board, rewarded the members who voted in favor of dismissing the charges, refused to read the charges to the membership, had Local 705's attorney meet *ex parte* with the trial board and provided information to the trial board and on the appeal without Antablin's knowledge, as alleged in paragraphs 46 through 68 hereinabove, to cause the trial board and the appeal to rule against Antablin, to present Antablin's charges as unjustified and lacking any merit and thereby harm Antablin's reputation and ability to obtain employment.

94.     The negative impact on Antablin's employment by the acts and omissions by Local 705 alleged herein was reasonably foreseeable by Local 705, based, among other things, on the practices in the industry and Local 705's admissions and understanding that reputation affects employment opportunities.

95.     Upon learning that Antablin was the only person receiving dues deferrals or short-term loans from Local 705 to enable her to be current in her dues, Local 705 cancelled its longstanding policy and practice of making dues deferrals or short-term loans to members to enable them to pay dues timely. Local 705 took this action in retaliation for Antablin's exercise of rights under Section 101(a)(2) and 101(a)(4) and to inflict financial harm on her.  By such actions, Local 705 violated Sections 101(a)(2) and (4) and 102 of the LMRDA.

96.     The actions alleged herein by Local 705 were undertaken as part of a pattern and plan to suppress dissent and to chill free speech among the members of Local 705 that included retaliation against Antablin and retaliation, discrimination and hostile actions against persons who Local 705 perceived to support Antablin.

97.     Local 705's actions alleged herein have and continue to cause Antablin damages, including loss of income and other economic benefits, injury to her reputation, physical illness and emotional distress, humiliation, anxiety, worry and sleeplessness.

98.     In taking the actions alleged herein, Local 705 acted with malice and ill will towards Antablin, to vex her, to punish and retaliate against her for exercising rights under the LMRDA, for her speech protected by the LMRDA and for instituting proceedings and being a witness before administrative agencies.

W H E R E F O R E, Antablin prays for relief as follows:

1.     For an award of damages in favor of Antablin and against Local 705 for lost wages, income and other benefits of employment, and consequential damages caused by Local 705's actions.

2.     For an award of damages in favor of Antablin and against Local 705 for injury to reputation and other consequential damages suffered by Antablin because Local 705's actions and violation of law alleged herein.

3.     For exemplary and punitive damages against Local 705.

4.     For attorney fees and costs.

5.     For such other and further relief as is appropriate on the evidence presented.


Dated: September 18, 2020.          KATZENBACH LAW OFFICES

                                    By   s/*Christopher W. Katzenbach*

                                    Christopher W. Katzenbach
                                    Attorneys for Plaintiff Melissa Antablin


///

///

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)

# JURY TRIAL DEMAND

Plaintiff Melissa Antablin demands a jury trial on all claims and issues in this case.

Dated:  September 18, 2020.          KATZENBACH LAW OFFICES
By   s/*Christopher W. Katzenbach*
Christopher W. Katzenbach
Attorneys for Plaintiff Melissa Antablin

First Amended Complaint For Violation of LMRDA
Case No. 2:18-cv-09474-RGK (SSx)